**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-cv-01726-RBJ-NYW

RUBEN ARAGON,

      Plaintiff,

v.

HILLEL ERLANGER,
MITCHELL BUTTERFIELD,
RHONDA FUNSTON,

      Defendants.

---

## RECOMMENDATION AND ORDER OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Nina Y. Wang

      This civil action comes before the court on the Motions for Summary Judgment filed by Defendant Hillel Erlanger ("Rabbi Erlanger or Defendant Erlanger") [#97, filed December 8, 2014] and by Defendants Mitchell Butterfield ("Defendant Butterfield") and Rhonda Funston ("Defendant Funston") (collectively, "CDOC Defendants") [#109, filed January 26, 2015]. Also before the court is Plaintiff's Motion to Strike Defendant Erlanger's Reply in support of his Motion for Summary Judgment [#145, filed April 6, 2015] and Plaintiff's Motion to Strike Defendants Butterfield and Funston's Reply in support of their Motion for Summary Judgment [#153, filed June 11, 2015]. These matters were referred to this Magistrate Judge pursuant to the Order Referring Case dated September 5, 2013 [#16], the Order of Reassignment dated February 9, 2015 [#116], and the memoranda dated March 11, 2015 [#134], April 6, 2015 [#146], and June 12, 2015 [#154].

After carefully considering the Motions and related briefing, the entire case file, and the applicable case law, I respectfully RECOMMEND that Defendant Erlanger's Motion for Summary Judgment be GRANTED and Defendants Butterfield and Funston's Motion for Summary Judgment be GRANTED IN PART and DENIED IN PART, and the Motion to Strike Defendant Erlanger's Reply is GRANTED and the Motion to Strike the CDOC Defendants' Reply is DENIED.

## PROCEDURAL HISTORY

Mr. Aragon, a *pro se* prisoner incarcerated at the Arkansas Valley Correctional Facility ("AVCF") in Ordway, Colorado, filed this lawsuit on July 1, 2013 pursuant to 42 U.S.C. § 1983 claiming his rights under the United States Constitution and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") had been violated. [#1]. Plaintiff also filed a motion for leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915, which was granted on July 2, 2013. [#3, #4]. That statute and the Local Rules of this District require a court to evaluate a prisoner complaint and dismiss *sua sponte* an action at any time if the action is frivolous, malicious, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); D.C.COLO.LCivR 8.1(b). On July 2, 2013, the court ordered Plaintiff to file an Amended Prisoner Complaint explaining "what each defendant did to him or her; when the defendant did it; how the defendant's action harmed him or her; and, what specific legal right the plaintiff believes the defendant violated." [#5 at 3 (quoting *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007)].

Plaintiff filed an Amended Complaint on August 26, 2013, asserting a claim for violation of the RLUIPA and his First Amendment right to practice "Messianic Jewish Diet and Religion"

as to each Defendant, Guy Edmonds, and Jeffrey Hill, for a total of five claims. [#9]. At all times pertinent to the allegations of the Amended Complaint, Plaintiff was housed at the Buena Vista Correctional Facility ("BVCF"). On December 20, 2013, Mr. Edmonds, Mr. Hill, Defendant Butterfield, and Defendant Funston filed a Motion for Partial Dismissal and an Answer. [#30 and #31]. On January 9, 2014, Defendant Erlanger filed a Motion to Dismiss in which he argued *inter alia* that he is not a state actor. [#34]. During the briefing period, Plaintiff was moved from BVCF to AVCF. After the Motions were fully briefed, Magistrate Judge Boland issued a Recommendation that the Motions be granted in part and denied in part. Specifically, Judge Boland recommended dismissing Mr. Edmonds and Mr. Hill from the case, dismissing the RLUIPA claims, dismissing claims against Defendants in their official capacity, dismissing any claim for compensatory damages, and finding as moot Plaintiff's request for declaratory or injunctive relief. [#51]. As to Defendants, Judge Boland found that Plaintiff had sufficiently pled that Rabbi Erlanger is a state actor, that Defendants Erlanger and Butterfield had personally participated in the alleged constitutional violation, and that Defendant Funston had personally participated in the alleged constitutional violation to the extent she allegedly prevented Plaintiff from observing Passover. [*Id.* at 8, 13-15]. District Judge Jackson adopted the Recommendation in an Order dated June 2, 2014, thereby granting in part and denying in part the Motions to Dismiss. [#55]. What remains to be resolved by the pending motions for summary judgment is whether Plaintiff can demonstrate that Defendants acting in their individual capacity violated his First Amendment rights, and whether he is entitled to punitive damages.

Plaintiff is a "Messianic Jewish Believer" who adheres to the kosher dietary laws of the Torah. [#151 at 4]. He represents that those who practice the Messianic Faith implement the kosher dietary laws of the Torah "into their every day walk of life as part of their faith practice." [*Id.* (internal quotations marks omitted)]. Plaintiff alleges that while working in the BVCF kitchen in July 2011, he noticed that "none of the kitchen staff knew anything about kosher rules, regulation or guidelines," and that the kitchen was operated differently depending on which meal coordinator was in charge for that week. [#9 at 4-5]. Plaintiff complained of the violations to a number of kitchen staff, who reported that Sergeant Butterfield "was in charge of everything Kosher and food related." [*Id.* at 5]. When Plaintiff asked Defendant Butterfield about how the kosher meals were prepared, and noted that kosher and non-kosher kitchen appliances, microwaves, and storage spaces were not kept separately, Defendant Butterfield denied any violation of kosher principles. [#9 at 5]. Plaintiff began filing grievances in an attempt to resolve the kitchen violations; some of the complaints were corrected for a short time before the violations resumed. [#9 at 5]. Plaintiff raised his concerns to Lieutenant Funston, the BVCF Religious Coordinator, and asked to meet with Rabbi Erlanger, who was responsible for inspecting the BVCF kitchen. On June 20, 2012, Plaintiff met with Defendant Erlanger, who allegedly acknowledged that certain violations had occurred and promised they would be corrected. [#9 at 9].

Plaintiff alleges that from April 2011 to August 2013, Rabbi Erlanger inspected and approved preparation of the Passover meals and kosher meals in a kitchen with no special preparation, cleaning of the area, and/or cleaning of the equipment to meet kosher requirements, and that he certified the kitchen without a hot water source and proper sinks "in which to

properly wash, clean and sanitize kosher fruits, vegetables and utencils [sic] and equipment." [*Id.* at 9]. Plaintiff further alleges that he complained of kosher violations to Defendant Butterfield as early as August 2011; and that from April 2012 to August 2013, Defendant Butterfield authorized staff to prepare the plaintiff's Passover meals in the kosher kitchen with no special preparation, cleaning of the area, and/or cleaning of the equipment to meet kosher requirements, and Defendant Butterfield authorized the use of the janitorial sink for kosher use and authorized non-kosher foods for consumption in kosher meals. [*Id.* at 13-14]. Plaintiff represents that his kosher meals were tampered with and that he received half servings, stale bread, and fruit cups that tasted like soap. [*Id.* at 7]. Finally, he alleges that Defendant Funston, as Religious Coordinator, held Passover one day late and denied his request to observe it on the correct week-day the following month, thereby preventing him from participating in the holiday. [*Id.* at 15, 25-26]. Plaintiff claims that Defendants' actions and inaction caused him to suffer "a substantial burden on his religious practice," and he felt pressured to withdraw from the kosher meal program "in fear for [his] health." [*Id.* at 7; #151 at 6].

Defendant Erlanger filed his Answer on May 22, 2014 [#54]. Judge Boland presided over a Scheduling Conference held June 24, 2014, at which he ordered the Parties to complete discovery by November 21, 2014, file dispositive motions by January 5, 2015, and prepare for a Final Pretrial Conference to be held March 5, 2015. [#57; #58].[1]

On December 8, 2014, Defendant Erlanger filed the pending Motion for Summary Judgment. [#97]. On January 22, 2015, Plaintiff filed a Motion for Extension of Time to respond to the Motion for Summary Judgment. [#107]. Judge Jackson denied the Motion,

---

[1] Judge Boland vacated the Pretrial Conference in a Minute Order dated January 7, 2015 [#103], and this matter was referred to the undersigned Magistrate Judge on February 9, 2015. [#116].

stating that the Response was due January 2, 2015 and Plaintiff had not requested an extension prior to when the deadline passed. [#112]. Plaintiff filed a Motion for Reconsideration of that Order [#120], which the court denied on February 23, 2015 [#130]. Plaintiff ultimately filed his Response out of time on March 3, 2015 [#132], and consistent with Judge Jackson's prior orders, the court will not consider it here for the purposes of this Recommendation. Defendant Erlanger filed his Reply on March 9, 2015. [#133].

On January 26, 2015, pursuant to leave for an extension of time, the CDOC Defendants filed their pending Motion for Summary Judgment. [#109]. On February 12, 2015, Plaintiff filed a Motion for Extension of Time to respond to the Motion for Summary Judgment. [#118]. Judge Jackson granted the Motion for Extension in part, and ordered Plaintiff to file his Response on or before March 27, 2015. [#128]. On March 30, 2015, Plaintiff filed a Motion for a Second Extension of Time to respond to the Motion for Summary Judgment. [#142]. This court granted that Motion and directed Plaintiff to file his Response on or before April 10, 2015. [#144]. Plaintiff subsequently filed a timely Motion requesting a third extension of time, which this court granted, allowing Plaintiff until May 5, 2015 to file a Response. [#148, #150]. Plaintiff filed his Response on April 28, 2015. [#151]. The CDOC Defendants filed a Reply on May 15, 2015. [#152].

On April 6, 2015, Plaintiff filed the pending Motion to Strike Defendant Erlanger's Reply in support of his Motion for Summary Judgment. [#145]. Defendant Erlanger filed a Response on April 13, 2015. [#147]. On June 11, 2015, Plaintiff filed the pending Motion to Strike the CDOC Defendants' Reply. [#153]. The CDOC Defendants filed a Response on July 2, 2015. [#155].

## UNDISPUTED MATERIAL FACTS

The following undisputed material facts are taken from the pending Motions for Summary Judgment [#97 at 4-5; #109 at 2-7]. Plaintiff is in the custody of the Colorado Department of Corrections ("CDOC") and currently housed at AVCF. [#97 at 4 ¶ 4; #109 at 2 ¶1]. When he filed the Complaint, and at all times pertinent to the allegations therein, Plaintiff was housed at BVCF. [#9, # 97 at 4 ¶ 3; #109 at 2 ¶ 1]. Plaintiff is a "Messianic Jewish Believer" who adheres to the kosher dietary laws of the Torah, and has practiced the Messianic faith since 1998. [#151 at 4, 28]. Plaintiff requested, and on June 13, 2011 was approved, to have a kosher diet at BVCF. [#109-3]. In July 2011, he held a prison job in the regular BVCF kitchen. [#9 at 4; #151 at 5]. On February 29, 2012, Plaintiff requested that his religious diet be cancelled; the cancellation was effective March 2, 2012. [#109-1 at ¶ 6; #109-1 at 4]. By signing the cancellation request, Plaintiff acknowledged that he must wait one year before requesting to reinstate the kosher diet. [#109-1 at 4]. On January 15, 2014, Plaintiff was transferred to AVCF where, upon entering the general population, he requested a kosher diet [#151 at 27], and his kosher diet was reinstated in February 2014. [#109-3].

### Rabbi Erlanger

Defendant Erlanger is, and was at all times relevant to the Amended Complaint, a Rabbi of the Jewish faith and an expert in Jewish dietary restrictions and kosher methods and procedures. [#97-1]. While Plaintiff was incarcerated at BVCF, CDOC was contracted with the organization "Scroll K" to provide advice on issues relating to Jewish dietary laws. [*Id.*] Defendant Erlanger was an employee of Scroll K, and CDOC consulted with him as an expert in Jewish dietary restrictions. [*Id.*] Defendant Erlanger did not oversee the preparation of kosher

meals at BVCF, was not otherwise present in the Facility's kitchen during food preparation, and did not supervise the BVCF kitchen staff.  [*Id.*; #151 at 51-52].

The consultation services included visits by Scroll K rabbis to CDOC facilities, where the rabbi would inspect the kitchen, speak with inmates regarding the kosher program, and submit his observations and suggestions in a report to the CDOC.  [#151 at 52].  The visits "are to provide constant reminders of the proper methods and processes that have to be followed for the food that is given to inmates to be considered kosher."  [*Id.*]  The Scroll K has no authority to execute the recommendations offered in the rabbis' reports.  [*Id.* at 53].

Mitchell Butterfield

Defendant Butterfield is a CDOC employee and the Food Service Commissary and Purchasing Supervisor at BVCF.  [#109-1 at ¶ 2].  In this capacity, he purchases food for all of BVCF, including kosher food, supervises the delivery and preparation of the kosher food, and assists the business office, support service manager, and warden with the facility's budget.  [*Id.* at ¶ 3].  Defendant is not personally involved in the preparation of kosher meals.  [*Id.* at ¶ 10].

The kosher food at BVCF is prepared in a designated room in accordance with the CDOC policies, guidelines, and menus, which were developed following consultation with Scroll K.  [*Id.* at 5-33; #155 at 51-52].  Rabbis associated with Scroll K review CDOC's kosher guidelines and menus.  [*Id.*]  The areas at BVCF designated for the preparation of kosher food meet Scroll K guidelines [*id.*], and most of the kosher food served at BVCF is purchased already prepared and ready to be served.  [# 109-1 at ¶ 11; #109-1 at 8].  Nonetheless, a rabbi from Scroll K conducts surprise inspections of the BVCF kitchens to ensure compliance.  [#151 at 52].  The rabbis inform appropriate Food Services personnel if they observe errors in the preparation of

kosher food and advise how to correct the mistake, they inspect the kosher food supplies and ensure that food that requires it is properly certified, and they confirm that utensils and kitchen accessories used to prepare kosher meals handle only kosher food.  [#109-1 at 26-33].

Rabbi Erlanger visited the BVCF kitchen on March 22, 2011; May 5, 2011; September 20, 2011; November 13, 2012; February 6, 2013; June 5, 2013; and October 17, 2013 and determined that the facility's kosher meal program was satisfactory.  [#109-1 at 26-33; #152-2, #152-3, #152-4].  He spoke with one inmate participating in the kosher meal program on each visit and each person with whom he spoke expressed satisfaction with the program.  [*Id.*]  Rabbi Erlanger visited the BVCF kitchen on March 20, 2012; May 17, 2012; and October 2, 2013 and determined that the facility's kosher meal program was not satisfactory.  [#151 at 37-40, 65].  Defendant Erlanger met with Plaintiff on June 20, 2012, to discuss Plaintiff's concerns with the kosher meal program.  [#109-1 at 34].  During that meeting, Plaintiff noted that he had removed himself from the kosher diet "a while ago," and asked questions regarding the preparation of kosher meals at BVCF to which Defendant responded.  [*Id.*]

<u>Rhonda Funston</u>

Defendant Funston is a Volunteer Coordinator who processes all BVCF inmates' requests for change of faith affiliation, religious diet changes, and to participate in their faith group's holy day observances.  She also notifies prisoners of upcoming holy day observances and provides them with a monthly schedule of all faith group and volunteer programs.  [#109-2 at ¶¶ 2, 3].

CDOC used a Passover 2012 guide to provide prisoners an overview of Passover along with a calendar of events. The Guide explained that "due to the length of time needed to order kosher and Passover foods, planning must begin a minimum of 120 days in advance," and

informed inmates that they would be notified by letter or other means approximately 90 business days prior to the start of Passover to sign up if they wanted to participate in the holiday. [#109-2 at ¶¶ 5, 6; #109-2 at 5-7]. In 2012, Passover began the evening of April 6 and ended the evening of April 14; accordingly, inmates who wished to participate were required to sign up by November 30, 2011. [#109-2 at ¶ 8; #109-2 at 9]. The participation list was submitted to the Food Service Office at CDOC Headquarters by December 5, 2011, was entered into the CDOC computer system, and then sent to the Volunteer Coordinator and each CDOC facility for review. [#109-2 at ¶¶ 9-11].

On November 8, 2012, Plaintiff submitted an Offender Communication form to the Volunteer Coordinator requesting that he be placed on the list to receive Passover/Seder meals for 2012. [#109-2 at ¶11]. Plaintiff was notified on December 5, 2011 that he had been placed on the participant list for Passover and Seder observances. [*Id.* at ¶¶ 12, 13; #109-2 at 18]. On April 3, 2012, Defendant Funston distributed a list of inmates participating in Passover and Seder throughout the BVCF housing units along with guidance as to times and locations of events associated with the holiday. [#109-2 at ¶ 14; #109-2 at 21-26]. Plaintiff was listed as a participant. [*Id.* at 24].

**STANDARD OF REVIEW**

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is

10

a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).   Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987).   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson,* 477 U.S. at 248.   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002).  Although the applicable summary judgment standard requires the court to view the facts in the light most favorable to the non-moving party, it does not require the court to make unreasonable inferences in favor of the non-moving party.  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) (quoting *Starr v. Downs*, 117 Fed. App'x. 64, 69 (10th Cir. 2004)). The nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case.  *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir. 1994) (citation omitted).  With respect to Defendant Erlanger's Motion for Summary Judgment [#97], because Plaintiff did not file a timely Response thereto [see #132], this court deems the properly

supported facts offered by Defendant Erlanger as true.  See Fed. R. Civ. P. 56(e)(2); *Lammle v. Ball Aerospace & Techs. Corp.*, Case No. 11-cv-3248-MSK-MJW, 2013 WL 4718928, at *1 (D. Colo. Sept. 1, 2013).  When, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998) (citation omitted).  Even where, as with Defendant Erlanger's Motion for Summary Judgment, certain facts have been deemed as true, the court may not enter summary judgment unless the moving party carries his burden under Rule 56 of the Federal Rules of Civil Procedure.  *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

Against this background, the court notes that "[a] *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)).  "The *Haines* rule applies to all proceedings involving a *pro se* litigant, including … summary judgment proceedings." *Id.* at n.3 (citations omitted).  However, the court cannot be a *pro se* litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008). *See also Anderson*, 477 U.S. at 256 (The nonmovant "may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."). Plaintiff's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998).  Conclusory statements based

merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence.  *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004).

## ANALYSIS

Title 42 U.S.C. § 1983 provides a vehicle that allows an injured person to seek damages for the violation of his or her federal constitutional rights against a person acting under color of state law.  *See* 42 U.S.C. § 1983; *see also West v. Atkins,* 487 U.S. 42, 48 (1988).  The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. "Inmates…retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (citation omitted).  These protections are not without reasonable limitations, and "a prison regulation imping[ing] on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests." *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (quoting *O'Lone*, 482 U.S. at 348-49).

The Tenth Circuit has adopted a two-step inquiry for district courts considering whether a prisoner-plaintiff has stated a constitutional violation based on a free exercise claim.  The plaintiff must first show that his "sincerely-held religious beliefs" were "substantially burdened." *Boles v. Neet,* 486 F.3d 1177, 1182 (10th Cir. 2007).  And he "must assert conscious or intentional interference with his free exercise rights to state a valid claim under § 1983." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).  After the plaintiff satisfies this requirement, the prison officials-defendants may "identif[y] the legitimate penological interests that justif[ied] the impinging conduct." *Boles,* 486 F.3d at 1182.  Upon such a showing, the

district court balances the factors set forth in *Turner v. Safley,* 482 U.S. 78, 89–91 (1987), to determine the reasonableness of the conduct:

> 1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Kay*, 500 F.3d at 1218-19 (quoting *Boles,* 486 F.3d at 1181).[2]  The Tenth Circuit recognizes that prisoners have a constitutional right to a kosher diet conforming to their religious beliefs. *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002).  *See also Makin v. Colorado Dep't. of Corrs.*, 183 F.3d 1205, 1214 (10th Cir. 1999) (failure to accommodate Muslim fasting requirements during Ramadan infringed on inmate's First Amendment rights).

## I.  Defendant Erlanger

Plaintiff alleges that Defendant Erlanger "inspected, approved, [and] continuously allowed," Defendant Butterfield and other BVCF staff to prepare his "(Passover meals) and (messianic Jewish diets) in the (kosher kitchen), where there was no special preparation cleaning of the area and/or cleaning of the equipment to meet kosher meals and or kosher kitchen requirements." [#9 at 30].  Plaintiff claims that Defendant Erlanger's failure to properly inspect the BVCF kitchen and supervise Defendant Butterfield, among other staff, "forced [Plaintiff] to get off the kosher diets, therefore causing [him] to modify [his] religious beliefs."  Defendant argues he is not a state employee and that Plaintiff has acknowledged such.  [#97; *see* Mr. Aragon's Responses to Rabbi Erlanger's Requests for Admissions, #97-1].

---

[2] *Turner* is applicable even where the plaintiff is challenging a prison official's individual actions, as opposed to a regulation.  *Boles*, 486 F.3d at 1181 n.4.

A § 1983 claim "must establish not only the deprivation of a right secured by the Constitution or laws of the United States, but also a deprivation committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999).   Private actors are excluded from § 1983 liability, no matter how discriminatory or wrongful their conduct.   *Id.* at 50.   "[S]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."   *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1143 (10th Cir. 2014) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.,* 531 U.S. 288, 295 (2001)).   "Chaplains and religious leaders do not automatically become state actors when they provide opinions on matters of dogma in response to inquiries from prison officials." *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 927 (9th Cir. 2011).

There is no dispute that Defendant Erlanger is employed by Scroll K, a private organization that is contracted with CDOC to provide advice on issues relating to Jewish dietary laws.   The question is whether Defendant Erlanger should nonetheless be considered a state actor.   The Supreme Court has outlined, and the Tenth Circuit has adopted, the following four tests to determine whether a private actor should be treated as a state actor for the purposes of § 1983 liability: "(1) the public function test, (2) the nexus test, (3) the symbiotic relationship test and (4) the joint action test."   *Anderson v. Suiters*, 499 F.3d 1228, 1233 (10th Cir. 2007) (citing *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937 (1982)).   *See also Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442, 1448 (10th Cir. 1995).   Defendant Erlanger does not specifically address any of these tests, and asserts only that he is a private actor.   In applying

each of these respective tests, this court concludes that Rabbi Erlanger should not be treated as a state actor.

There are two categories of allegations with respect to Defendant Erlanger's alleged restriction of Plaintiff's free exercise of religion: failure to properly inspect the BVCF kitchen; and failure to properly supervise Defendant Butterfield and the BVCF kitchen staff. Plaintiff's admissions that Erlanger served no supervisory role whatsoever [*see* #97-1] factually negates the second category of allegations, leaving this court to consider only whether Erlanger should be considered a state actor with regard to his inspection duties.

The public function test consists of determining whether the state has delegated to a private party "a function traditionally exclusively reserved to the States." *Johnson v. Rodrigues*, 293 F.3d 1196, 1203 (10th Cir. 2002) (citation omitted). This is an arduous standard to satisfy because, "[w]hile many functions have been traditionally performed by governments, very few have been exclusively reserved to the State." *Id.* (citation and quotation marks omitted). The record contains no evidence indicating that the service provided by Rabbi Erlanger, through his employer Scroll K, was historically a function of the state or that CDOC could not procure this service from another source. *See id.* (noting that the public function test typically implicates private parties who hold elections, perform necessary municipal functions, or run a nursing facility.).

Pursuant to the nexus test, Plaintiff must demonstrate that "there is a sufficiently close nexus between the government and the challenged conduct such that the conduct may be fairly treated as that of the State itself." *Johnson*, 293 F.3d at 1203 (quoting *Gallagher*, 49 F.3d 1442, 1448 (10th Cir. 1995)) (internal quotation marks omitted). Under this approach, "a state

normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* The record indicates that Defendant Butterfield often accompanied Rabbi Erlanger during his inspections at BVCF [#109-1 at 26-33; #151 at 37-39], but does not demonstrate that the inspections were a collaborative effort between Erlanger and Butterfield or that Butterfield contributed in any way to Erlanger's determinations and reports. Nor is there evidence showing that Defendants Erlanger and Butterfield had any relationship with each other, incentivized each other in anyway, or that Butterfield exercised coercive power over Erlanger or encouraged him to take specific action.[3]

With respect to the "symbiotic relationship test," the state must have "so far insinuated itself into a position of interdependence with a private party that it must be recognized as a joint participant in the challenged activity." *Johnson*, 293 F.3d at 1204 (quoting *Gallagher*, 49 F.3d at 1451) (internal quotation marks omitted). As noted above, CDOC and Scroll K are involved in a standard contractual relationship that extends no further than consultation services and surprise inspections of the kosher kitchen at BVCF. *See Gallagher*, 49 F.3d at 1453 ("Payments under government contracts and the receipt of government grants and tax benefits are insufficient to establish a symbiotic relationship between the government and a private entity."). There are no allegations, not to mention evidentiary support, indicating that CDOC has "insinuated itself into a position of long-term interdependence" with either Rabbi Erlanger or Scroll K. *Id.* at 1204-05 (defining "symbiosis" as "the living together in more or less intimate association or even close union of two dissimilar organisms" or "the intimate living together of two dissimilar organisms

---

[3] Indeed, Defendant Erlanger determined during inspections held March 20, 2012; May 17, 2012; and October 2, 2013 that the BVCF kosher program was unsatisfactory. [#151 at 38, 40, 65].

in any of various mutually beneficial relationships; mutual cooperation between persons and groups in a society especially when ecological interdependence is involved.").

Finally, "state action is also present if a private party is a willful participant in joint action with the State or its agents." *Johnson*, 293 F.3d at 1205 (quoting *Gallagher,* 49 F.3d at 1453) (internal quotation marks omitted).  This analysis typically requires an assessment of "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.*  Private action taken "with the mere approval or acquiescence of the State is not state action." *Wittner v. Banner Health*, 720 F.3d 770, 777 (10th Cir. 2013).  Again, there is no evidence of joint action.  The record reflects that Defendant Erlanger performed at least ten surprise inspections between March 2011 and October 2013 [109-1 at 23-33; #151 at 37-40, 65; #152-2, #152-3, #152-4]; nothing suggests that Defendant Butterfield participated in those inspections other than to accompany Erlanger through the facility at times, or that the reports submitted to CDOC contained anything other than Erlanger's individual and independent comments.

 Having applied these four tests to the facts before me, I bear in mind that the ultimate purpose is to "assure that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Brentwood Acad.*, 531 U.S. at 295 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982)).  I do not find that CDOC is responsible for Defendant Erlanger's action or inaction with respect to how or when he inspected BVCF or how he reported his findings.  Accordingly, I find that § 1983 liability cannot lie as to Defendant Erlanger.

## II.   CDOC Defendants

Plaintiff alleges that Defendant Butterfield approved non-kosher foods for consumption, failed to correct violations of the preparation of kosher meals when brought to his attention, and failed to properly supervise and train the BVCF kitchen staff with regard to maintaining a kosher kitchen, and thus "forced Plaintiff to get off the kosher diets…[and] modify [his] religious beliefs and quit [his] kitchen job."  [#9 at 13-14].  Plaintiff alleges that Defendant Funston held Passover observances one day late, on April 7, 2012, and denied his request that same day to be placed on the Messianic Jewish Passover list for a May observance, thereby preventing him from participating in Passover.  [#9 at 15-16; #151 at 6]].

### A.   Standing

The CDOC Defendants argue that Plaintiff does not have standing to assert a First Amendment violation with regard to the kosher meals at BVCF because he was not a recipient of the kosher meals between March 3, 2012 and February 2014.[4]  "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III," and the plaintiff bears the burden of demonstrating he has standing to assert a claim.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  To satisfy the standing requirement, Plaintiff must allege *inter alia* the existence of an "injury in fact" that he suffered personally, as opposed to an injury suffered by someone with whom he shares a common interest.  *Id.*  I agree with the CDOC Defendants that Plaintiff cannot demonstrate the requisite personal injury in fact as to alleged violations of the

---

[4] Although the section header refers to April 2012 to August 2013, in the body of the text, Defendants Butterfield and Funston argue that their standing argument applies to the time period between February 29, 2012 and February 2014.  [#109 at 10-11].

kosher meal preparation at the BVCF kitchen for the period during which he did not participate in the kosher program.

However, Plaintiff alleges that he noticed and began reporting "Kosher and health care violations" as early as August 2011, which is approximately seven months before he was removed from the kosher diet. [#9 at 4; #151 at 26]. Therefore, this court finds that Plaintiff has standing to assert a First Amendment claim regarding his kosher diet as to Defendant Butterfield for the period extending from August 2011 to February 2012.

### B. Sincerely Held Religious Belief

The CDOC Defendants next argue that Plaintiff has not demonstrated a First Amendment violation because he voluntarily canceled his kosher diet, thereby evidencing a lack of sincerity in his religious beliefs, and the record does not establish that the kosher meal plan was unsatisfactory. [#109 at 12-13]. Plaintiff states he is a Messianic Jewish Believer and has practiced his faith since 1998. [#151 at 4]. He attests that he removed himself from the kosher diet for fear for his health: he tasted soap in the fruit cups, "the food portions were small, the bread was stale, and it was making [him] ill"; he "often experienced stomach cramps and sometimes vomiting"; and he "was not receiving adequate nutrition" and "feared for [his] health emotionally and physically." [*Id.* at 27-28].

A substantial burden on religious exercise exists "when a government ... prevents participation in conduct motivated by a sincerely held religious belief." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010). As to whether the belief is sincere, such an inquiry "is almost exclusively a credibility-assessment," and "can rarely be determined on summary judgment." *Kay*, 500 F.3d at 1219 (quoting *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1352

(10th Cir. 1997)).  Indeed, "summary dismissal on the sincerity prong is appropriate only in the very rare case in which the plaintiff's beliefs are so bizarre, so clearly nonreligious in motivation that they are not entitled to First Amendment protection."  *Id.* at 1219-20 (internal quotation marks and citation omitted).  I find that Plaintiff has demonstrated a substantial burden on the exercise of his religious beliefs, and that Plaintiff's sincerity with regard to his beliefs is, at the very least, a question of material fact.

As to the preparation of kosher food, the evidentiary record Defendants reference demonstrates only that the kosher meal plan was satisfactory during months when Plaintiff either was not yet housed at BVCF (March 2011 and May 2011) or was not participating in the kosher meal plan (November 13, 2012; February 6, 2013; June 5, 2013, and October 17, 2013).  The one exception is an audit by Defendant Erlanger dated September 20, 2011. [#152-5].  Plaintiff attests to a variety of violations he observed and of which he was informed with regard to the preparation of kosher food at BVCF,[5] though does not identify an associated time frame.  [*See* #151 at 25-26].[6]  The CDOC Defendants reply only that Plaintiff has no standing to assert violations after he ceased participating in the kosher meal program and that the facility's kosher program was rated satisfactory by the Scroll K rabbis while Plaintiff was a participant.  [#152].  The CDOC Defendants have not put forth sufficient evidence to establish that either no kosher violations occurred between August 2011 and February 2012, or that Defendant Butterfield took

---

[5] Plaintiff submits the affidavit of inmate Robert Wayne Robinson, who attests to working in the BVCF kitchen as a kosher cook and witnessing violations of kosher practices in October 2011. [#151 at 59].  Plaintiff also submits the affidavit of inmate William Barnett, who attests to working in the BVCF kitchen as a kosher cook from 2009 until 2011, and to using the same utensils and appliances for preparation of kosher and non-kosher food. [#151 at 61-62].

[6] This court does not consider for the purposes of this Recommendation Plaintiff's attestation of violations that occurred between March 2012 and February 2014. [*See, e.g.,* #151 at 27, 37].

action to correct violations that were brought to his attention.  Nor does Defendant Butterfield

represent that legitimate penological interests justified the alleged impinging conduct.  *See Boles,*

486 F.3d at 1182-1183.  He simply disagrees that the kosher meals at BVCF were improperly

prepared.[7]  Accordingly, I find that Defendant Butterfield is not entitled to summary judgment on

the First Amendment claim.

### C.   Passover Observance

Finally, the CDOC Defendants argue that Plaintiff's First Amendment claim against

Defendant Funston fails because the record demonstrates she included him as a participant in the

2012 Passover observance and took no action to prevent him from observing the holiday.

Plaintiff responds that BVCF improperly held Passover on April 7, 2012, and required the

Messianic Believers to observe Passover alongside the Jewish inmates in contravention of

Messianic faith and practice.  [#151 at 24 ("Due to the major fundamental differences in faith

tenets, the Jewish and Messianic Jewish groups [can] not celebrate Passover together.")].  He

attests that on April 7, 2012, he submitted a request to Defendant Funston to observe Passover on

May 6, 2012, and that she ignored his request.  [*Id.*].  Plaintiff represents that the book of

Numbers, Chapter 9, verses 9-14 of the Torah authorizes believers to observe a second Passover

the month following the originally scheduled holiday.  [*Id.*]

The CDOC Passover 2012 guide specified that Passover would be held April 7 through

April 14, 2012, that April 6 would mark the "Eve of Passover," and April 7 would constitute the

"First Day of Passover."  [#109-2 at 7, 8].  The Guide instructed that those who wished to

---

[7]  Because Defendant Butterfield does not argue that a regulation or penological interest
prevented him from complying with kosher principles, this court does not reach the *Turner*
factors to determine the reasonableness of the proffered regulation or interest.

participate in the holiday could fast "on the day prior to Passover," and would receive a sack breakfast to eat "before daybreak the morning before Passover."  [#109-2 at 5, 7, 10].  The Special Event Proposal dispensed by Defendant Funston informed the inmates that Passover observance would begin the evening of April 6, and the specially-prepared Passover meals would be served beginning the morning of April 7.  Plaintiff received notice on December 5, 2011 that he was signed up to participate in "the Passover and the Seder observances beginning on April 6th."  [#109-2 at 17].  Indeed, the first Seder was scheduled to begin April 6, 2012 at 8:05 p.m.  [*see* #109-2 at 11].  Plaintiff does not allege that the fast planned for April 6 or the first Seder were not held as indicated in the Guide.  Furthermore, the Memorandum circulated by Defendant Funston on April 3, 2012 stated that the Messianic Jewish offenders would observe Passover in "MPR#1" and the Jewish offenders would observe Passover in "MPR#2" [#109-2 at 22], thus demonstrating that the followers of the two faiths were separated.  Plaintiff alleges merely that Passover was held a day late, but does not specify how he defines the start of the holiday.  The record shows that Passover observances began the evening of April 6, as indicated in all the related materials disseminated to the prisoners.  [#109-2].

That Defendant Funston did not organize a second Passover to begin May 6, 2012, and thus coordinate an identical schedule of observances and specially prepared meals for Plaintiff to participate in one month after his April 7 request does not state a viable constitutional violation.  Plaintiff had been informed months earlier that Passover observances would begin the evening of April 6, that April 7 would mark the first full-day of the holiday, and that the facility required at least 120 days to prepare the menu and order the meals. [*Id.* at 2 ¶ 6].  Defendant Funston does not argue that a regulation or penological interest prevented her from organizing a second

Passover.  However, I find that each of the four *Turner* factors weighs in Defendant Funston's favor: the CDOC, and BVCF in particular, has a budgetary interest in preparing for only one Passover; Plaintiff was allowed to participate in the April Passover and was notified that he had been listed as a participant; accommodating Plaintiff's request to participate in a May Passover would have burdened the facility not only fiscally but with respect to manpower and the coordination of guards [*see* #109-2 at 21 (instructions for security specific to Passover)]; and the easier alternative was for Plaintiff to observe Passover during the scheduled dates in April. Accordingly, I find no disputed material fact as to whether Defendant Funston violated Plaintiff's First Amendment rights, and recommend that summary judgment be entered in her favor.

## III.    Qualified Immunity

The CDOC Defendants also assert that they are immune to Plaintiff's claims for monetary damages against them in their individual capacities.  The doctrine of qualified immunity "shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998) (internal quotation marks omitted).  Qualified immunity is an affirmative defense to § 1983 liability (*see Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995)); once a defendant asserts the defense, the plaintiff must demonstrate that qualified immunity is not proper by showing that "(1) the defendant's conduct violated a constitutional right and (2) the law

governing the conduct was clearly established at the time of the alleged violation." *DeSpain*, 264 F.3d at 971 (quoting *Baptiste*, 147 F.3d at 1255).

As discussed above, a question of fact exists as to whether Defendant Butterfield restricted Plaintiff's free exercise of his religion.  In addition, the Tenth Circuit held as early as 2002 that an inmate's right to free exercise of religion includes the right to a diet that conforms with his or her religious beliefs.  *Beerheide*, 286 F.3d at 1185.  Accordingly, I find that Defendant Butterfield is not entitled to qualified immunity at this stage.

In contrast, I find that Defendant Funston is entitled to qualified immunity because Plaintiff has not demonstrated a clearly established constitutional right to have a second Passover in May 2012.

## IV.    Damages

Pursuant to Judge Jackson's June 2, 2014 Order [#55], Plaintiff is not entitled to compensatory damages but may seek punitive damages associated with the claims discussed herein.  While I recommend that the Motion for Summary Judgment be denied as to Defendant Butterfield, I do not find that the Complaint identifies sufficient facts to support that Defendant Butterfield acted with evil motive or intent or with reckless or callous indifference.  *See Smith v. Wade*, 461 U.S. 30, 56 (1983).  Thus, while Plaintiff may be entitled to nominal damages (*see Searles v. Van Bebber*, 251 F.3d 869, 879 (10th Cir.2001), *cert. denied*, 536 U.S. 904 (2002)) he is not entitled to the punitive variety.

## V.    Motions to Strike

Plaintiff asks the court to strike Defendant Erlanger's Reply in support of his Motion for Summary Judgment [#133] as an abusive filing "with evidence not previously presented in a bad

faith attempt to deprive [him] a fair opportunity to respond to the Defendants [sic] sham affidavits." [#145]. Plaintiff also argues that the Reply "is not in compliance with local district Court rules and the page limitations." [*Id.*] The Practice Standards of Judge Jackson, the presiding judge in this matter, limits parties to five pages when filing a reply in support of a motion for summary judgment. Defendant Erlanger's Reply consists of twelve substantive pages.[8] [#133]. Defendant Erlanger did not ask for or receive leave of court to exceed the page limitation. Furthermore, in reaching this Recommendation, this court did not consider Plaintiff's untimely Response to Defendant Erlanger's Motion for Summary Judgment and likewise did not consider Erlanger's Reply.

Plaintiff similarly asks the court to strike the CDOC Defendants' Reply in support of their Motion for Summary Judgment [#152] as an abusive filing attempting to introduce evidence that should have been presented in the Motion. [#153]. In particular, Plaintiff claims that Defendants attempt in their Reply to discuss the previously unaddressed allegations of constitutional violations that occurred between August 2011 and April 2012, and takes issue with Defendants attaching missing portions of an affidavit that was originally filed with the Motion. This court finds nothing improper with Defendants' Reply, and its five substantive pages[9] is within the limits allowed by the court. Moreover, having determined that Plaintiff lacked standing to assert kosher violations after February 2012, this court did not rely on the newly introduced exhibits docketed as [#152-2], [#152-3], and [#152-4] in considering the sole claim against Defendant Butterfield.

---

[8] Defendant attached thirty pages of exhibits to the Reply.
[9] Defendants attached forty-four pages of exhibits to the Reply.

## CONCLUSION

For the foregoing reasons, this court RECOMMENDS that:

(1)      Defendant Erlanger's Motion for Summary Judgment [#97] be GRANTED; and

(2)      Defendants Butterfield and Funston's Motion for Summary Judgment [#109] be

DENIED as to Defendant Butterfield and GRANTED as to Defendant Funston; and

(3)      Plaintiff's claims for punitive damages be DISMISSED,[10] and

IT IS ORDERED:

1.  The Motion to Strike [#145] is GRANTED; and

2.  The Motion to Strike [#153] is DENIED.

---

[10] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED: July 23, 2015                    BY THE COURT:


                                        s/Nina Y. Wang_____
                                        United States Magistrate Judge