IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-01726-RBJ-BNB

RUBEN ARAGON,

     Plaintiffs,

v.

HILLEL ERLANGER,
GUY EDMONDS,
MITCHELL BUTTERFIELD,
RHONDA FUNSTON, and
JEFFREY HILL,

     Defendants.

---

## ORDER

---

    This matter is before the Court on defendant Erlanger's motion for summary judgment, defendants Butterfield and Funston's motion for summary judgment, and the Recommendation of Magistrate Judge Nina Y. Wang that this Court grant the Erlanger motion and grant in part the Butterfield/Funston motion.[1]  The recommendation is incorporated herein by reference.  *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

    The recommendation advised the parties that specific written objections were due within fourteen (14) days after being served with a copy of the recommendation.  ECF. No. 156 at 27. In response to motions from both parties, the Court extended the deadline for objections for all parties to September 4, 2015.  ECF No. 163.  Mr. Butterfield and Ms. Funston filed a timely

---

[1] Judge Wang also recommended that the Court, grant plaintiff's motion to strike Rabbi Erlanger's reply in support of his motion for summary judgment and deny plaintiff's motion to strike Mr. Butterfield and Ms. Funston's reply.

objection.  ECF No. 164.  Mr. Aragon's objections were entered on September 5, 2015, but he deposited the document in the prison mail system on September 2, 2015, so the Court will consider his objections as timely.  ECF No. 165.  The Court has reviewed all of the relevant pleadings and Judge Wang's recommendation.  After its de novo review, the Court adopts the recommendation in part and rejects it in part.

## BACKGROUND

Judge Wang thoroughly outlines the procedural history in this case.  ECF No. 156 at 2-6.  The Court sees no need to repeat it here.  The following facts are undisputed.  The plaintiff, Mr. Aragon, is a pro se prisoner in the custody of the Colorado Department of Corrections ("CDOC").  ECF No. 97 at 4¶4.  At all relevant times, Mr. Aragon was housed at the Buena Vista Correctional Facility (BVCF).  ECF No. 9.  He is a "Messianic Jewish Believer" who adheres to the kosher dietary laws of the Torah, and he has practiced the Messianic faith since 1998.  ECF No. 151 at 4, 28.  Mr. Aragon asked to have a kosher diet, and his request was approved on June 13, 2011.  ECF No. 109-3.

In July 2011, Mr. Aragon held a prison job in the regular BVCF kitchen.  ECF No. 9 at 4.  On February 29, 2012, he cancelled his kosher diet, and the cancellation was effective March 2, 2012.  ECF 109-1 at ¶6; ECF No. 109-1 at 4.  In accordance with prison policy, Mr. Aragon acknowledged that he must wait one year before reinstating the kosher diet.  ECF No 109-1 at 4.  On January 15, 2014, Mr. Aragon was transferred to the Arkansas Valley Correctional Facility (AVCF) where he requested a kosher diet.  ECF No. 151 at 27.  His kosher diet was reinstated in February 2014.  ECF No. 109-3.

Rabbi Hillel Erlanger

While Plaintiff was incarcerated at the BVCF, the CDOC contracted with the
organization "Scroll K" to provide advice on Jewish dietary laws.  ECF No. 97-1.  Rabbi
Erlanger was an employee of Scroll K, and he served as an expert consultant on Jewish dietary
restrictions and kosher methods and procedures.  *Id.*  Rabbi Erlanger did not oversee the
preparation of kosher meals at BVCF, was not otherwise present in the kitchen during food
preparation, and did not supervise the BVCF kitchen staff.  *Id.*; ECF No. 151 at 51-52.

During consultation visits to BVCF, Rabbi Erlanger would inspect the kitchen, speak
with inmates regarding the kosher program, and report his observations and suggestions to the
CDOC.  ECF No. 151 at 52.  The visits were "to provide constant reminders of the proper
methods and processes that have to be followed for the food that is given to inmates to be
considered kosher."  *Id.*  Scroll K had no authority to execute the recommendations offered in the
rabbis' reports.  *Id.* at 53.

The kosher food at BVCF is prepared in a designated room in accordance with CDOC
guidelines and menus.  *Id.* at 5-33.  CDOC developed these policies following consultation with
Scroll K.  ECF No. 155 at 51-52.  Rabbis who work for Scroll K review CDOC's kosher
guidelines and menus.  *Id.*  The areas at BVCF designated for the preparation of kosher food
meet Scroll K guidelines [*id.*], and most of the kosher food served at BVCF is purchased already
prepared and ready to be served.  ECF No. 109-1 at ¶11; *Id.* at 8.

A rabbi from Scroll K conducts surprise inspections of the BVCF kitchens to ensure
compliance.  ECF No. 151 at 52.  The rabbis inform CDOC personnel if they observe errors in
the preparation of kosher food.  They also advise the food services employees on how to correct

the mistake.  Rabbis inspect the kosher food supplies and ensure that it is properly certified, and they confirm that kosher food is prepared with utensils and kitchen accessories used exclusively for that purpose.  ECF No. 109-1 at 26-33.

On seven separate occasions, Rabbi Erlanger visited the BVCF kitchen and determined that the facility's kosher meal program was satisfactory.  ECF No. 109-1 at 26-33.  These visits occurred on March 22, 2011, May 5, 2011, September 20, 2011, November 13, 2012, February 6, 2013, June 5, 2013, and October 17, 2013.  ECF No. 152-2; ECF No. 152-3; ECF No. 152-4.  Rabbi Erlanger spoke with one inmate participating in the kosher meal program on each of these visits, and each person with whom he spoke expressed satisfaction with the program.  *Id.*

On three different visits, Rabbi Erlanger determined that the BVCF kosher meal program was unsatisfactory.  ECF No. 151 at 37-40, 65.  These visits occurred on March 20, 2012, May 17, 2012, and October 2, 2013.  *Id.*  Rabbi Erlanger met with Mr. Aragon on June 20, 2012 to discuss Mr. Aragon's concerns with the kosher meal program.  ECF No. 109-1 at 34.  During that meeting, Mr. Aragon noted that he had removed himself from the kosher diet "a while ago," and he asked questions regarding the preparation of kosher meals at BVCF to which Rabbi Erlanger responded.  *Id.*

<u>Mr. Mitchell Butterfield</u>

Mr. Butterfield is a CDOC employee and the Food Service Commissary and Purchasing Supervisor at BVCF.  ECF No. 109-1 at ¶2.  In this capacity, he purchases food for all of BVCF, including kosher food, supervises the delivery and preparation of the kosher food, and assists the business office, support service manager, and warden with the facility's budget.  *Id.* at ¶3.  Mr. Butterfield is not personally involved in the preparation of kosher meals.  *Id.* at ¶10.

<u>Ms. Rhonda Funston</u>

Ms. Funston is a CDOC employee. ECF No. 109-2 at ¶1. She serves as Volunteer Coordinator. *Id.* at ¶2. In that role, Ms. Funston processes all BVCF inmates' requests to change their faith affiliation, to alter their religious diet, and to participate in their faith group's holy day observances. *Id.* at¶2. She also notifies prisoners of upcoming holy day observances and provides them with a monthly schedule of all faith group and volunteer programs. *Id.*

In 2012, CDOC used a Passover guide to provide prisoners with information about that year's Passover. ECF No. 109-2 at ¶5. The guide included a calendar of events. *Id.* The document explained that "due to the length of time needed to order kosher and Passover foods, planning must begin a minimum of 120 days in advance." *Id.* at ¶6. It also informed inmates that they would be notified by letter or other means approximately 90 business days prior to the start of Passover to sign up if they wanted to participate in the holiday. *Id.* at ¶7.

That year, Passover began the evening of April 6 and ended the evening of April 14. Therefore, inmates who wished to participate were required to sign up by November 30, 2011. *Id.* at ¶ 8. The participation list was submitted to the Food Service Office at CDOC Headquarters by December 5, 2011, was entered into the CDOC computer system, and then sent to the Volunteer Coordinator at each CDOC facility for review. *Id.* at ¶¶9-10.

On November 8, 2011, Mr. Aragon submitted an offender communication form to Ms. Funston requesting that he receive "Passover/Seder meals" for 2012. *Id.* at ¶11. On December 5, 2011, Mr. Aragon was notified that he had been placed on the participant list for Passover and Seder observances to begin on April 6. *Id.* at ¶¶12-13. On April 3, 2012, Defendant Funston distributed a list of inmates participating in Passover and Seder throughout

the BVCF housing units along with guidance as to times and locations of events associated with the holiday.  *Id.* at ¶14; *Id.* at 21-26.  Mr. Aragon was listed as a participant.  *Id.* at 24.

### STANDARD OF REVIEW

Following the issuance of a magistrate judge's recommendation on a dispositive matter, the district court judge must "determine de novo any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Rule 56(a).

When a case involves a pro se party, courts will "review his pleadings and other papers liberally and hold them to a less stringent standard than those drafted by attorneys."  *Trackwell v. U.S. Government*, 472 F.3d 1242, 1243 (10th Cir. 2007).  However, "it is not the proper function of the district court to assume the role of advocate for the pro se litigant."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  A broad reading of a pro se plaintiff's pleadings "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based…conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."  *Id.*  Pro se parties must "follow the same rules of procedure that govern other litigants."  *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (internal quotations and citations omitted).

### ANALYSIS

**A.  <u>Section 1983 Actions</u>.**

As Judge Wang noted, under 42 U.S.C. § 1983 an individual may seek damages for a violation of his constitutional rights against a person acting under color of state law.  Here Mr. Aragon alleges that his right to freely exercise his religious beliefs, guaranteed by the First and

Fourteenth Amendments, has been violated by the manner in which kosher dietary restrictions practiced by Messianic Jews were observed while he was an inmate at the BVCF. He bears the burden of showing that a prison official "substantially burdened [his] sincerely-held religious beliefs." *Kay v. Bemis,* 500 F.3d 1214, 1218 (10th Cir. 2007). This requires more than isolated acts of negligence. He must show that the official consciously or intentionally interfered with his free exercise rights. *Gallagher v. Shelton,* 587 F.3d 1063, 1070 (10th Cir. 2009). If he meets this burden, the official may still defend by showing that the challenged conduct was reasonably related to a legitimate penological interest. *Boles v. Neet,* 486 F.3d 1177, 1182 (10th Cir. 2009).

### B. **Defendant Erlanger's Motion for Summary Judgment.**

Mr. Aragon claims that Rabbi Erlanger permitted BVCF staff to prepare his meals in violation of kosher requirements. ECF No. 9 at 10. He alleges that Rabbi Erlanger's failure properly to inspect the kitchen and to supervise the staff "forced [Plaintiff] to get off the kosher diets, therefore causing [him] to modify [his] religious beliefs." *Id.* Judge Wang correctly notes that because Mr. Aragon has admitted that Rabbi Erlanger did not play a supervisory role, the allegation regarding failure to supervise is moot. ECF No. 156 at 16.

In his motion for summary judgment, Rabbi Erlanger argues that he is not a state employee and therefore is not liable under § 1983. ECF No. 97. A § 1983 claim "must establish not only the deprivation of a right secured by the  Constitution or laws of the United States, but also a deprivation committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999). It is undisputed that Rabbi Erlanger works for Scroll K, which is a private organization that contracts with CDOC to consult on Jewish dietary laws. However, the issue is whether Rabbi Erlanger should be considered a state actor despite his employment with a private entity.

Judge Wang applied a four-factor test derived from *Lugar v. Edmondson Oil Co.,* 457 U.S. 922 (1982). *See Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442, 1447-57 (10th Cir.1995) (the nexus, symbiotic relationship, joint action, and public function tests). On my review I conclude that she thoroughly analyzed Rabbi Erlanger's relationship with CDOC under each test. *Id.* I agree with her analysis and cannot improve upon it. Accordingly, because Rabbi Erlanger does not qualify as a state actor under any test, he is not subject to § 1983 liability.

**C. <u>Qualified Immunity</u>.**

1. <u>Qualified immunity generally.</u>

Both Ms. Funston and Mr. Butterfield argue that they are protected from Mr. Aragon's claim for money damages by the doctrine of qualified immunity. This doctrine "shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Toevs v. Reid*, 646 F.3d 752, 755 (10th Cir. 2011) (internal quotations and citations omitted). When the defense asserts a qualified immunity defense, the summary judgment standard is subject to a "somewhat different analysis from other summary judgment rulings." *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006).

When a defendant raises qualified immunity, the burden shifts to the plaintiff. *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir. 2001) (internal quotations and citations omitted). The plaintiff "must show that the defendant's actions violated a specific statutory or constitutional right," and that the right was "clearly established at the time of the conduct at issue." *Steffey*, 461 F.3d at 1221. If a plaintiff does succeed in carrying his burden, the defendants then bear the

burden of showing that there are no material issues of fact that would defeat their claim of qualified immunity. *Lighton v. University of Utah,* 209 F.3d 1213, 1221 (10th Cir. 2000).

2. Ms. Funston.

The first prong of Mr. Aragon's burden in overcoming the defendants' qualified immunity defense requires the Court to determine whether the plaintiff "sufficiently asserted the violation of a constitutional right." *Lighton,* 209 F.3d at 1221. I do not question Mr. Aragon's right to observe Passover. *Cf. Makin v. Colorado Department of Corrections,* 183 F.3d 1205, 1211-14 (10th Cir. 1999) (right of a Muslim inmate to observe Ramadan). However, the plaintiff "must do more than abstractly identify an established right, but must specifically identify the right and conduct . . . which violated that right." *Steffey,* 461 F.3d at 1221. Thus, Mr. Aragon must come forward with evidence that, if believed, could lead a reasonable jury to find that Ms. Funston's "substantially burdened" his right to freely exercise his religious beliefs and that Ms. Funston's actions constituted "conscious or intentional interference." *Gallagher,* 587 F.3d at 1069.

Mr. Aragon claims that the BVCF improperly observed Passover in April, 2012, and that Ms. Funston as the Volunteer Coordinator who oversaw faith groups' observance of religious holidays was responsible. More specifically, he alleges that the observance of Passover began one day late, because it was held on April 7, 2012 when it should have been started on April 6. ECF No. 151 at 4-5. Further, he states that the BVCF required the Messianic Believers to observe Passover alongside other Jewish inmates in contravention of Messianic faith and practice. *Id.* at 24. He also claims that "Ms. Funston deliberately made sure I missed" Passover. ECF No. 9 at 15 ¶8. Finally, he claims that on April 7, 2012, he submitted a request to Ms. Funston to observe Passover on May 6, 2012, and she ignored his request. *Id.* at ¶9.

The CDOC Passover 2012 guide, prepared with assistance from Rabbi Yisroel Rosskamm from the Scroll K group, specified that Passover would be held April 7 through April 14, 2012; that April 6 would mark the "Eve of Passover;" and that April 7 would constitute the "First Day of Passover."  ECF No. 109-2 at 5-8.  The guide specified that participants could fast "on the day prior to Passover," and they would receive a sack breakfast to eat "before daybreak the morning before Passover."  *Id.* at 5, 7, 10.  The guide outlined that the first Seder was scheduled for April 6, 2012 at 8:05 p.m.  *Id.* at 11.  Mr. Aragon has provided no evidence that under this schedule Passover was "late" or otherwise improperly observed.  The fact that the guide was prepared with the assistance of a rabbi, whose expertise in this matter has not been questioned, indicates the contrary.

Mr. Aragon received notice on December 5, 2011 that he was signed up to participate in "the Passover and Seder observances beginning on April 6th."  ECF No. 109-2 at 17.  The list of participants indicated that he would participate in Passover as a Messianic Jew.  *Id.* at 18.  On April 2, 2012, Ms. Funston circulated another list that again included Mr. Aragon as a Messianic Jew who would participate in Passover.  *Id.* at  24.  In her affidavit Ms. Funston confirmed that she did not deny Mr. Aragon's request to be included in the 2012 Passover observance, and she states that she took no action to cause him to miss the observance.  *Id.* at 3.

Ms. Funston's April 2, 2012 memorandum also stated that the Messianic Jewish participants would observe Passover in "MPR#1," and the Jewish participants would observe Passover in "MPR#2."  *Id.* at 22.  This was in accord with the CDOC Passover 2012 guide which provided, "Due to the major fundamental differences in faith tenets, the Jewish and Messianic Jewish groups will not celebrate Passover together."  *Id.* at 8.

Judge Wang found that Mr. Aragon had not alleged that the 2012 Passover observance did not take place according to the schedule in the CDOC guide.  ECF No. 156 at 23.  She found that Ms. Funston did not organize a second Passover, as she understood Mr. Aragon to have requested, but that Mr. Aragon "has not demonstrated a clearly established constitutional right to have a second Passover in May 2012."  ECF No. 156 at 25.  She concluded that Ms. Funston is entitled to qualified immunity.  *Id.*

In his Objection Mr. Aragon argues that the fact that Passover was scheduled to begin on April 6, 2012 does not prove that the schedule was followed.  ECF No. 165 at 14.  However, he has come forward with no evidence that it was not followed.  He states that, despite Ms. Funston's memorandum, "the DOC staff at BVCF did not allow the Messianic Jewish Believers to meet in the MPR#1 as outlined and posted."  *Id.*  Again, he provides no evidence of that. Assuming for the sake of argument that someone on "the DOC staff" changed the room assignments, Mr. Aragon provides no evidence that this was Ms. Funston's decision, or even if it was, that the decision was made consciously or intentionally to interfere with anyone's religious rights.  He also provides no evidence that Ms. Funston prevented him from participating in the Passover observance.

As for the "second" Passover, Mr. Aragon clarifies that he was not requesting a second Passover.  Rather, since DOC violated his rights with respect to the April Passover, he wanted another Passover to be scheduled a month later.  ECF No. 165 at 16.  However, absent evidence that the April 2012 Passover was deficient, or that Mr. Aragon was wrongfully excluded from it, there is no basis to criticize Ms. Funston for not scheduling what amounts to be a make-up Passover in May 2012.

In sum, the Court recognizes the possibility that BVCF could have erred in the planning or execution of Passover in April 2012. However, the Court must not engage in speculation in considering whether or not a constitutional violation occurred. Here, Mr. Aragon's mere allegations that the prison did not properly hold Passover or permit him to participate in it, without any evidence that Ms. Funston was responsible or that she interfered with his religious rights consciously or intentionally, are insufficient to establish a constitutional violation. The idea behind the qualified immunity doctrine is that you cannot sue a public official for money damages if you do not have the goods. He does not. Accordingly, the Court agrees with Judge Wang that Mr. Aragon has not met his burden in overcoming Ms. Funston's qualified immunity defense.

3. Mr. Butterfield.

As with Ms. Funston, Mr. Aragon faces a difficult two-part burden in overcoming Mr. Butterfield's defense of qualified immunity. The Tenth Circuit recognizes that a prisoner's right to free exercise of religion includes the right to a diet that conforms to their religious beliefs. *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002). While this right is arguably clearly established, Mr. Aragon must offer specific evidence that Mr. Butterfield's actions or inactions did substantially burden his religious beliefs. He must then show that Mr. Butterfield intentionally or consciously interfered with his free exercise rights. *Gallagher,* 587 F.3d at 1069. Mr. Aragon's evidence must be robust enough to lead a reasonable jury to conclude that Mr. Butterfield violated his right to the free exercise of religion.

To begin, the Court agrees with Judge Wang's determination that Mr. Aragon's religious beliefs are sincerely held. ECF No. 156 at 20. The Court also agrees with Judge Wang's conclusion that Mr. Aragon has standing to assert a First Amendment violation as to Mr.

Butterfield from August 2011 or even July 2011 (when he was transferred to the BVCF) to February 29, 2012 (when he requested that his religious diet be cancelled immediately, ECF No. 109-1 at 4).  That narrows the issue to whether Mr. Aragon has come forward with evidence sufficient to create a genuine dispute as to whether Mr. Butterfield consciously or intentionally did something during that seven or eight month period that substantially burdened his right to have a kosher diet.

In support of his claim Mr. Aragon offers five declarations:

- First, in his own declaration [ECF No. 151 at 23-29] he states that he started working in the kitchen at BVCF in July 2011 and began to observe various kosher violations by kitchen staff that he believed amounted to constitutional violations. *Id.* at 24, ¶B.1.  He "brought these Constitutional violations to the attention of Butterfield, as early as August 2011," but Mr. Butterfield said he was doing nothing wrong.  *Id.* at 25, ¶B.3.  Specifically, he told Mr. Butterfield that the kosher cooks were using a non-kosher can opener.  *Id.,* ¶B.4.  In response Mr. Butterfield gave him two documents.  *Id.*  The documents, included in the record as Exhibits G-1 and G-2 to Mr. Aragon's Amended Complaint, are copies of the CDOC policy that requires that equipment for the kosher diet, including the can opener, must be purchased new, dedicated to the kosher program, and labeled "FOR KOSHER USE ONLY" and an excerpt from a publication, "How to Keep Kosher."  Mr. Aragon further states that after several complaints Mr. Butterfield told him that everything being done in the kosher kitchen was approved and authorized by a Jewish rabbi.  *Id.,* ¶B.5.[2]

---

[2] In his Amended Complaint Mr. Aragon alleges that from April 2012 to August 2013 Mr. Butterfield authorized prison workers to prepare "my similarly situated prisoners" Passover meals in the kosher

- Second, Robert Wayne Robinson, a fellow inmate and Messianic Jew, states that on or about October 11, 2011, while he was working as a kosher cook at the BVCF, he witnessed and was trained in certain practices that he believes violated both kosher and state health requirements.  He lists washing kosher food and kosher utensils in a warehouse non-kosher certified sink (and concealing that practice from health department inspectors and rabbis); using a non-kosher certified can opener to open kosher food cans when the kosher opener broke down; boiling water for kosher meals in the main kitchen's kettle; failing to prepare the kosher kitchen properly for Passover, including failing to thoroughly clean the kitchen of chometzs; and (as instructed by the rabbi) washing kosher food in the kosher kitchen hand sink; and being given non-kosher foods to use in the preparation of kosher meals.  Mr. Robinson does not attribute any of these practices specifically to Mr. Butterfield.  ECF No. 151 at 59-60.

- Third, Eddie Lobato who worked in "the B.V.C.F. kitchen," provides information apparently relating to July 2012.  There is no indication in his affidavit that he has knowledge of events occurring in the August 2011 to February 2012 period.  ECF No. 151 at 60.

- Fourth, William Barnett, who worked as a kosher cook at the BVCF "from 2009 through 2011," states that he was never "trained" in kosher rules or guidelines, but he was instructed by Mr. Butterfield and occasionally by Captain Edmonds and Lieutenant Hill.  Mr. Barnett states that he was instructed to wash kosher

---

kitchen when there was no special preparation or cleaning to meet kosher requirements.  He also alleges that Mr. Butterfield authorized the use of the warehouse janitorial sink for kosher use.  ECF No. 9 at 13. Allegations in a complaint are not evidence, but even if I were to accept them as equivalent to his declaration, the alleged acts occurred while Mr. Aragon was not maintaining a kosher diet.  Therefore, I do not discuss them further.

produce and kosher equipment in the warehouse janitorial sink or the kosher kitchen hand sink because there was no other sink in the kosher kitchen (the instruction to wash fruits and vegetables in the kosher kitchen sink was provided by a rabbit).  He says that he was told that, if asked, he should keep this practice from health department inspectors.  He was instructed to use the heavy duty can opener in the main kitchen to open kosher food cans, because there was no kosher-only heavy duty can opener.  Also, because there is no hot water source in the kosher kitchen, he was instructed to supply hot water for kosher meals from the kettle in the main kitchen.  Also, he says the eggs for kosher meals were steamed in the main kitchen because they only had one microwave which was shared by all.  Mr. Barnett did not specifically attribute any of these instructions to None of these instructions was specifically attributed by Mr. Barnett to Mr. Butterfield.  However, he does say that at times when they ran out of fruit, Mr. Butterfield had them use non-kosher labeled fruit and fruit cans.  Finally, he states that there was never any special effort made to prepare for Passover meals or other Jewish holiday celebrations.  ECF No. 151 at 61-62.

- Finally, Charles J. McMillian, an inmate who states that he received kosher meals at the BVCF from February 2007 until he transferred to another facility in April 2011, states that he often complained about dietary matters, and he has continued to do so in his new facility.  He does not mention Mr. Butterfield.  He does state that "the 'employed' CDOC rabbi continually adjusts his duty to Yahuah[sic] by authorizing the use of un-certified kosher products and practices."  ECF No. 151 at 63.

15

Judge Wang noted that Mr. Aragon had attested to "a variety of violations he observed and of which he was informed with regard to the preparation of kosher food at BVCF, though [he] does not identify an associated time frame."  ECF No. 156 at 21.  She cited the affidavits of Mr. Robinson and Mr. Barnett.  She found that "[t]he CDOC Defendants reply only that Plaintiff has no standing to assert violations after he ceased participating in the kosher meal program and that the facility 's kosher program was rated satisfactory by the Scroll K rabbis while Plaintiff was a participant."  *Id.*  She concluded,

> The CDOC Defendants have not put forth sufficient evidence to establish that either no kosher violations occurred between August 2011 and February 2012, or that Defendant Butterfield took action to correct violations that were brought to his attention."  Nor does Defendant Butterfield represent that legitimate penological interests justified the alleged impinging conduct.  He simply disagrees that the kosher meals at BVCF were improperly prepared.  Accordingly, I find that Defendant Butterfield is not entitled to summary judgment on the First Amendment claim.

*Id.* at 22 (citations and footnote omitted).

Although I have indicated my agreement in all other respects with Judge Wang's analysis and recommendations, which were provided in a very thoughtful 28-page order, I respectfully disagree with her conclusion with respect to Mr. Butterfield.  I do so for several reasons:

a.  First, one must keep the issue in perspective.  Mr. Aragon is complaining that during a period of time when he was housed at the BVCF and was observing a kosher diet – July 2011 through February 2012 – Mr. Butterfield violated his constitutional right to be provided a complying diet.  To be unconstitutional, however, Mr. Butterfield's actions must have imposed a "substantial burden" on Mr. Aragon's religious rights, and he must have done so "consciously or intentionally."

b.  During that time period of time Mr. Aragon did not file an internal grievance against

Mr. Butterfield.[3]

c.  Mr. Aragon did file a grievance on March 2, 2012.  He complained  that his right to

participate in the kosher diet program had been violated in several ways: (1) canned goods have

been opened in the main kitchen using a non-kosher can opener; (2) use of improper sinks to

wash kosher vegetables, fruits and utensils; (3) use of hot boxes from the main kitchen in the

kosher kitchen; (4)(a) obtaining hot water for kosher meals from the main kitchen; (4)(b) use of a

kosher cooking pot for non-kosher meals; (5) use and cleaning of kosher carts and coolers in the

main kitchen and other non-kosher purposes; (6)(a) watering down of meals with milk from the

main kitchen; and (6)(b) feeding kosher inmates non-kosher canned fruits.  *Id.*  However, he did

not attribute any of these alleged violations to Mr. Butterfield in either the Step 1 or Step 2

grievances.

d.  According to Mr. Aragon, he first complained to Mr. Butterfield (about the use of a

non-kosher can opener) in August 2011.  Mr. Butterfield provided a copy of the policy that

requires equipment in the kosher kitchen to be purchased new, dedicated to the kosher program,

and labeled "FOR KOSHER USE ONLY."  There is no evidence in the record that Mr.

Butterfield did not believe that the policy was followed or that he was aware that an improper

---

[3] Although the parties have not raised the issue, it is not clear to me that Mr. Aragon exhausted his administrative remedies.  Under the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  CDOC Administrative Regulation 850-04 establishes a three-step grievance procedure available to inmates.  *See Snyder v. Harris,* 406 F. Appx 313, 315 (10th Cir. 2011) (unpublished).  The inmate must complete the administrative process.  *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir. 2002).  Mr. Aragon's first grievance at the BVCF was filed on March 2, 2012.  ECF No. 9 at 23 (grievance # R-BV11/12-00016560-1).  He was not satisfied with the response and filed a Step 2 grievance.  *Id.* at 24.  The response is partially cut off.  The record contains no evidence of which I am aware that he filed a Step 3 grievance.

can opener had been used.  Mr. Aragon provided no evidence as to when the improper can

opener had been used, or the circumstances for such use.

e.  Mr. Aragon states that, in response to further complaints, Mr. Butterfield told him that

everything being done in the kosher kitchen was approved and authorized by a Jewish rabbi.

There is no evidence in the record suggesting that Mr. Butterfield did not believe that.  In fact,

Rabbi Erlanger inspected the facility on March 20, May 17 and September 20, 2011, and each

time he determined that the facility's kosher meal program was satisfactory.  In contrast, Rabbi

Erlanger determined that the program was not satisfactory on two occasions in 2012 and one

occasion in 2013, when Mr. Aragon was not participating in the program.  Moreover, there is no

evidence that Mr. Butterfield was responsible for, or did not respond to, whatever caused the

unsatisfactory reviews at those times.

f.  Some of the matters of which Mr. Aragon complains appear to have been temporary

responses to a practical necessity.  For example, Mr. Robinson states that staff used the "non-

kosher certified heavy duty can opener when the kosher domestic can opener broke down."  ECF

No. 151 at 59.  Mr. Barnett states that Mr. Butterfield had him use non-kosher labeled fruit cans

when they ran out of fruit.  *Id.* at 61.  The BVCF had a responsibility to provide all inmates with

nutrition.  The Tenth Circuit has advised that not "every infringement on a religious exercise will

constitute a substantial burden."  *Strope v. Cummings*, 381 F. App'x 878, 881-82 (10th Cir. 2010)

(internal quotations and citations omitted) (holding that an inmate's sporadic and minor

complaints about inadequate or non-kosher food did not constitute a substantial burden).  There

is a "distinction between substantial burden and inconvenience."  *Abdulhaseeb v. Calbone,* 600

F.3d 1301, 1321 (10th Cir. 2010) (holding that the outright denial of a halal diet with approved

meats was actionable, but that an incident in which "a prisoner's meal was rendered inedible by

service of prohibited items contaminating his tray was not actionable.").  It is reasonable to assume that "as the frequency of presenting unacceptable foods increases, at some point the situation would rise to the level of a substantial burden."  *Id.*; *see also Gallagher,* 587 F.3d at 1070 (holding isolated violation of kosher restrictions did not support a free exercise claim).

g.  Mr. Aragon's affidavits identified certain unsavory incidents.  For example, he states that a kosher cook told him that an inmate urinated in the janitorial sink where food was sometimes cleaned.  ECF No. 151 at 26.  Setting aside the hearsay, if such an incident occurred, there is no evidence that Mr. Butterfield permitted it, or was even aware of it, or tolerated it if he was informed of it.  Mr. Robinson and Mr. Barnett state that the use of a non-kosher certified sink to wash food and utensils was concealed from health department inspectors and the rabbis.  *Id.* at 59.  There was no evidence that Mr. Butterfield gave any such instruction.

h.  Mr. Butterfield does not deny that Mr. Aragon made him aware of his concerns.  Mr. Butterfield notes that "while I don't recall specifically any complaints Mr. Aragon brought to my attention regarding food preparation in the kosher area, I do know that when Mr. Aragon brought his complaints to my attention, I mentioned to him that I would look into it."  ECF No. 152-1 at ¶8.  However, Mr. Aragon does not present any specific evidence about whether Mr. Butterfield took any remedial action.  The Court acknowledges Judge Wang's analysis that Mr. Butterfield seems to simply disagree that the kosher meals at BVCF were improperly prepared without offering detailed evidence in support of his claim.  ECF No. 156 at 22.  However, despite the weaknesses in Mr. Butterfield's argument, Mr. Aragon bears the evidentiary burden at this stage.

i.  At bottom, based on my de novo review of the file, I find no evidence that, even if believed, would be likely to cause a reasonable jury to find that Mr. Butterfield imposed a

substantial burden on Mr. Aragon's right to participate in a kosher diet program during July 2011 through February 2012, or certainly that he did so consciously or intentionally.

Therefore, I conclude that Mr. Aragon has not met his burden to establish the first prong of an exception to the doctrine of qualified immunity.  Mr. Butterfield is entitled to summary judgment on that basis.

### D.  Motions to Strike.

Mr. Aragon asks the Court to strike Rabbi Erlanger's reply in support of his motion for summary judgment [ECF No. 133] as an abusive filing "with evidence not previously presented in a bad faith attempt to deprive [him] a fair opportunity to respond to the Defendants [sic] sham affidavits."  ECF No. 145.  Upon my review, I agree with Judge Wang's recommendation to grant the motion to strike Rabbi Erlanger's reply.  ECF No. 156 at 26.  Mr. Aragon also asks the Court to strike Mr. Butterfield and Ms. Funston's reply in support of their motion for summary judgment [ECF No. 152] as an abusive filing attempting to introduce evidence that should have been presented in the original motion.  ECF No. 153.  Upon my review, I agree with Judge Wang that there is nothing improper with the defendants' reply.  ECF No. 156 at 26.

### ORDER

For the forgoing reasons, it is ORDERED that the Recommendation of United States Magistrate Judge Wang [ECF No. 156] is adopted in part and rejected in part:

1. Rabbi Erlanger's motion for summary judgment [ECF No. 97] is GRANTED;

2. Ms. Funston's motion for summary judgment [ECF No. 109] on the defense of qualified immunity is GRANTED;

3. Mr. Butterfield's motion for summary judgment [ECF No. 109] on the defense of qualified immunity is GRANTED;

4.   The motion to strike [ECF No. 145] is GRANTED; and

5.   The motion to strike [ECF No. 153] is DENIED.

Judgment will enter in favor of the defendants, Rabbi Erlanger, Ms. Funston, and Mr.

Butterfield.  Judgment will enter against the plaintiff, Mr. Ruben Aragon.

DATED this 1st day of October, 2015.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge